**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| v. | : | **Case No.  DKC-18-066** |
| | : | |
| **DONALD MARCELL RIVERS, JR.,** | : | |
| | : | |
| Defendant | : | |

---

## DEFENSE SENTENCING RESPONSE MEMORANDUM

Donald Rivers, Jr., by and through his undersigned counsel, Katherine Tang Newberger and Rebecca Talbott, hereby respectfully submits this memorandum in response to the government's sentencing memorandum in this case.  ECF No. 80.  As correctly determined by the U.S. Probation Office in this case, Mr. Rivers is not a career offender, and the government's argument to the contrary ignores clear Fourth Circuit precedent.  Furthermore, the Court should reject the government's request that the Court vary upward to the equivalent of a career offender sentence, because the career offender guideline has been roundly criticized and is not followed by sentencing judges in 78.3 percent of the cases in which it applies.  Finally, the government's arguments in support of the obstruction-of-justice and aggravating role adjustments are unpersuasive.

## ARGUMENT

Contrary to the government's argument, Mr. Rivers does not qualify as a career offender, and should not be sentenced in the career offender guideline range.  First, Mr. Rivers does not qualify as a career offender under the U.S. Sentencing Guidelines because his prior conviction for Maryland conspiracy to distribute cocaine, PSR ¶ 52, does not constitute a "controlled substance offense" under the Guidelines.  This is true for two independent reasons.  The first reason is that only conspiracy

offenses that include an overt-act requirement qualify as conspiracy offenses under application note 1 of the commentary to U.S.S.G. § 4B1.2—and Maryland conspiracy does not require an overt act. The second, and independent, reason is that conspiracies never constitute "controlled substance offenses" (or "crimes of violence") under § 4B1.2 because conspiracies are not listed in the text of the guideline but only in the commentary, which cannot be relied upon to enlarge the text of the guideline itself.[1]

      <u>Second</u>, regardless of whether the Court holds that Mr. Rivers qualifies for a career offender enhancement, Mr. Rivers should not receive a sentence within or near the career offender guidelines range, as requested by the government. Even for defendants who technically qualify for the career offender designation—which Mr. Rivers does not—the career offender guideline range is excessively harsh in the vast majority of cases. Even the U.S. Sentencing Commission has criticized the career offender guideline, especially for individuals whose predicate offenses involve drug distribution, and, according to the Sentencing Commission, in Fiscal Year 2017 only 21.7% of those designated as career offenders received sentences within the career offender guidelines range.[2] That means judges granted downward departures or variances in 78.3% of cases in which the career offender guidelines applied. Where, as in the case of Mr. Rivers, the career offender guideline would catapult him into a sentencing

---

[1]      For the same reasons, Mr. Rivers's base offense level for the relevant conduct in Group 2 (possession of a firearm) is 20, not 24. *See* PSR ¶ 31. To trigger a base offense level of 24, Mr. Rivers would have to have two prior convictions for a "controlled substance offense." U.S.S.G. § 2K2.1(a)(2). For purposes of determining the applicable offense level under § 2K2.1, the term "controlled substance offense" has the same definition as it does under the career offender guideline. *See* § 2K2.1 cmt. app. n. 1 (incorporating definition from § 4B1.2(b)). Thus, a base offense level of 24 under § 2K2.1 and a "career offender" designation under § 4B1.1 both require the government to establish that Mr. Rivers has two prior convictions for a "controlled substance offense," as that term is defined in § 4B1.2(b). Accordingly, the analysis is the same for both inquiries.

[2]      U.S.S.C., *Quick Facts: Career Offenders* (FY 2017), https://www.ussc.gov/research/quick-facts/career-offenders (hereinafter "U.S.S.C., *Quick Facts: Career Offenders*").

range more than *double* his otherwise-applicable range,[3] and *10 times* the length of his longest prior

period of incarceration,[4] the advisory range produced by the career offender guideline is excessively

severe, would violate the mandates of 18 U.S.C. § 3553(a), and should not be followed.

Furthermore, as argued in the Defense Sentencing Memorandum (ECF No. 78), Mr. Rivers

should not receive upward adjustments for obstruction of justice or for being an organizer or leader,

both of which the government requests.  While the Defense Sentencing Memorandum addressed the

inapplicability of these two adjustments at great length, we briefly respond herein to a few factual

assertions made by the Government in its sentencing memo.

## I.        Mr. Rivers Is Not a Career Offender.

The Presentence Report correctly concluded that Mr. Rivers is not a career offender.

### A.        Mr. Rivers Is Not a Career Offender Because His Prior Conviction for Maryland Conspiracy Does Not Qualify as a Controlled Substance Offense under the Guidelines, Including the Commentary Regarding Inchoate Offenses.

This year, the U.S. Court of Appeals for the Fourth Circuit has made clear that not all

conspiracy offenses qualify as career offender predicates under § 4B1.2(b) and its commentary.  In

*United States v. McCollum*, 885 F.3d 300 (4th Cir. 2018), the Fourth Circuit considered whether a prior

conviction for conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C.

§ 1959(a)(5), constituted a "crime of violence" for purposes of determining the defendant's base

offense level under § 2K2.1(a)(4)(A).  *McCollum*, 885 F.3d at 304.  The Fourth Circuit recognized that

---

[3]        Mr. Rivers's correctly calculated guideline range without the career offender guideline is 141 to 151 months.  *See* ECF No. 78, Defense Sentencing Memo, at 2-3.  The advisory range that would be produced by the career offender guideline in this case is 272 to 319 months.  *See* U.S.S.G. § 4B1.1 & Ch. 5, Pt. A (offense level 31 at CHC VI, plus 7 years consecutive).

[4]        Mr. Rivers's longest period of incarceration prior to this offense was 29 months.  PSR ¶ 51.

the term "crime of violence" in § 2K2.1(a) is defined by cross reference to § 4B1.2, the career offender guideline, which includes conspiracies in application note 1. The Court found that the guidelines text and case law required the Court to apply the categorical approach, *id.* at 306-07, and thus a prior conviction for conspiracy would constitute a "crime of violence" only if its elements were the same as or narrower than "generic conspiracy." *Id.* at 307-308. The *McCollum* court explained that a generic conspiracy includes an overt-act requirement. *Id.* at 308. Thus, the Court reasoned, any conspiracy offense that ***lacks*** an overt-act requirement does ***not*** constitute a "crime of violence" under § 4B1.2 because it would involve conduct that sweeps more broadly than generic conspiracy. *Id.* at 309.[5]

This past summer, the Fourth Circuit applied *McCollum*'s analysis to a conspiracy drug offense. In *United States v. Whitley*, 737 F. App'x 147, 2018 WL 2972662 (4th Cir. June 12, 2018), the Fourth Circuit considered whether a federal conspiracy drug distribution offense constituted a "controlled substance offense" under § 4B1.2(b). Applying *McCollum*, the Court held that federal drug conspiracy, in violation of 21 U.S.C. § 846, could qualify as a career offender predicate only if federal drug conspiracy qualified as a "conspiracy" under the commentary to § 4B1.2. *Id.* at 149. The court explained:

> Because the Guidelines do not define "conspiracy," the term "should be understood to refer to the generic, contemporary meaning of the crime." [*McCollum*, 885 F.3d at 304-05] (internal quotation marks omitted). An overt act is an element of the generic definition of conspiracy. *Id.* at 308. Comparing the elements of conspiracy under 21 U.S.C. § 846 to this generic definition, it is clear that they do not correspond to generic conspiracy.

---

[5]     The *McCollum* Court declined to reach the broader question of whether a "conspiracy" could ever qualify as a predicate offense under § 4B1.2. The Court explained that because it was granting relief to the defendant on the narrower theory—that his prior conspiracy conviction did not qualify as a generic conspiracy—it would "not address McCollum's alternative theory" for relief: that the Sentencing Commission cannot use the commentary to expand the definition of "crime of violence" to include conspiracy. *See McCollum*, 885 F.3d at 303 n.2.

*Whitley*, 737 F. App'x at 149.  Accordingly, the Fourth Circuit panel held that Whitley's prior conviction for federal drug conspiracy, in violation of 21 U.S.C. § 846, did not qualify as career offender predicate, "because § 846 does not require an overt act." *Id.*

Together, *McCollum* and *Whitley* make clear that a conspiracy offense constitutes a predicate offense under § 4B1.2 and application note 1 only if it meets the generic definition of conspiracy—that is, if it has an overt-act requirement.  The conviction identified in PSR ¶ 52 is for "conspiracy to distribute cocaine" under Maryland law.  Based on *McCollum* and *Whitley*, Mr. Rivers's conspiracy to distribute cocaine conviction in Washington County Circuit Court Case No. 21-K-11-046375 would constitute a "controlled substance offense" for purposes of § 4B1.2(b) only if Maryland conspiracy includes an overt-act requirement.

The Court of Appeals of Maryland, the state's highest court, has held that under Maryland law, conspiracy offenses do not include an overt-act requirement.  *See Carroll v. State*, 428 Md. 679, 696-97, 53 A.3d 1159, 1169 (Md. 2012) ("A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. . . . The crime is complete when the agreement is formed, and ***no overt acts are necessary to prove a conspiracy.***") (internal quotation marks omitted); *accord* Gov't Sentencing Memo at 7 ("Maryland criminal conspiracy does not require an overt act.").  Therefore, no conviction for conspiracy under Maryland law can constitute a "crime of violence" or "controlled substance offense" under § 4B1.2 and application note 1.

The government attempts to avoid this ineluctable application of *McCollum* and *Whitley* by citing to *Etienne v. Lynch*, 813 F.3d 135 (4th Cir. 2015).  But this *Etienne* argument was directly considered and rejected by the Fourth Circuit in *McCollum*:

> In *Etienne*, we had to decide whether the definition of conspiracy under the Immigration and Naturalization Act (the "INA") adopted the common law definition, which did not require an overt act. We relied on the "settled principle of statutory

5

construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms," *id.* at 143 (quoting *United States v. Shabani*, 513 U.S. 10, 13 (1994)) (emphasis added), to conclude that conspiracy under the INA did not require an overt act, *id.* at 145. Here, by contrast, we interpret Guidelines written by the Sentencing Commission, which requires us to consider a crime's contemporary meaning, not its common law meaning—a distinction that the dissent fails to appreciate. *See* U.S.S.G. Supp. to App. C, amend. 798 (2016), at 129. *Etienne* in fact acknowledges that "the prevailing contemporary meaning of [conspiracy] . . . requires proof of an overt act." 813 F.3d at 142.

*McCollum*, 885 F.3d at 308.

Accordingly, Mr. Rivers's conviction for Maryland conspiracy to distribute narcotics (PSR ¶ 52) does not constitute a controlled substance offense under § 4B1.2(b), and he does not qualify as a career offender.[6]

> **B.     Mr. Rivers Is Not a Career Offender Because Conspiracy Can Never Qualify as a "Controlled Substance Offense" under § 4B1.2 Because the Commentary, Which Purports To Supplement the Definition To Add Inchoate Offenses, Cannot Enlarge the Text.**

Mr. Rivers's conviction for Maryland conspiracy fails to qualify as a "controlled substance offense" for a more fundamental reason as well: **_No_** conspiracy can qualify as a "controlled substance offense" under § 4B1.2(b) unless the commentary to the guideline can be used to expand the text of the guideline.  It cannot.

The text of the guideline defines "controlled substance offense" as follows:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b).

------

[6]     And for the same reason, he faces a base offense level of 20 under § 2K2.1 for Group 2.

The commentary to this guideline, in application note 1, purports to enlarge the scope of the definition to include inchoate offenses:

> For purposes of this guideline—"Crime of violence" and "controlled substance offense" include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses.

§ 4B1.2 cmt. app. n. 1.

However, a guideline cannot be enlarged by its commentary. In May 2018, the U.S. Court of Appeals for the D.C. Circuit held that application note 1 to § 4B1.2 cannot be used to enlarge the text of what constitutes a controlled substance offense as that term is defined in § 4B1.2(b). *See United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018). In *Winstead*, the Court concluded that "Section 4B1.2(b) presents a very detailed 'definition' of controlled substance offense that clearly excludes inchoate offenses." 890 F.3d at 1091. The Court went on to hold that the Commission could not enlarge the text of § 4B1.2(b) through commentary. *Winstead* involved convictions for attempted drug offenses. Both attempts and conspiracies are inchoate offenses that appear only in the commentary. Thus, according to *Winstead*, neither an attempt nor conspiracy can ever constitute a "controlled substance offense" under § 4B1.2(b) absent the Commission's formally amending the text of § 4B1.2(b) to include inchoate offenses.

A unanimous panel of the Sixth Circuit recently agreed with this reasoning. In *United States v. Havis*, -- F. 3d ---, 2018 WL 5117187, at *1 (6th Cir. Oct. 22, 2018), a three-judge panel called for a rehearing en banc, to determine whether its prior decision in *United States v. Evans*, 699 F.3d 858, 862 (6th Cir. 2012), should be overruled to accord with the reasoning of the D.C. Circuit in *Winstead*. The court explained that the defendant had persuasively argued that in extending the coverage of § 4B1.2 to include inchoate offenses through the commentary, the Commission had unconstitutionally exceeded its delegated power by using commentary to add to the guidelines text. *Havis*, -- F.3d ---, 2018 WL 5117187, at *2-3 (explaining that commentary cannot increase "the range of conduct that

the Guidelines cover" because commentary, unlike a textual amendment, is not submitted to Congress for review nor subject to notice and comment).

Thus both the D.C. Circuit and a panel of the Sixth Circuit have recognized that extending the coverage of § 4B1.2 to inchoate offenses via the commentary was an unlawful exercise of the Commission's delegated powers, and thus was a nullity. The Fourth Circuit's decision in *McCollum* is not in conflict with *Winstead*. In *McCollum*, the Fourth Circuit acknowledged that the defendant had also challenged the use of the commentary to enlarge the text of § 4B1.2 to include conspiracies, but stated that "[b]ecause we hold that McCollum is entitled to resentencing under his first theory, we do not address his alternative theory." *McCollum*, 885 F.3d at 303 n.2. Although the Fourth Circuit did not decide the issue in *McCollum*, Judge Bredar has considered it and found in favor of the defendant. In *United States v. Lisbon*, 276 F.Supp.3d 456 (D. Md. 2017), Judge Bredar held that RICO conspiracy never qualifies as a "controlled substance offense" because the rule of lenity required the Court to accept the defendant's argument that the commentary to § 4B1.2 conflicted with the text of § 4B1.2 rather than merely interpreting it. The government's sentencing memorandum in this case contains no argument to avoid this result.

Therefore, for two independent reasons, Mr. Rivers's conviction for Maryland conspiracy to distribute cocaine (PSR ¶ 52) is not a "controlled substance offense" under § 4B1.2(b). Because he has only one qualifying predicate offense, he does not qualify for the career offender enhancement.[7]

---

[7]     And, likewise, his base offense level for Group 2 (possession of a firearm) is 20, not 24.

II.     **Mr. Rivers Should Not Be Sentenced in the Career Offender Guideline Range.**

A.      **This Court Is Free To Reject the Guidelines Range Based on a Policy Disagreement with the Guidelines, including with the Career Offender Guideline.**

Sentencing judges may vary from the guidelines based not just on a consideration of individualized sentencing factors, but also based on a policy disagreement with the guidelines that applies in the mine-run of cases. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (drug guideline) ("[A]s a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."); *Spears v. United States*, 555 U.S. 261, 264-66 (2009) (drug guideline) (holding that "district courts are entitled to reject and vary categorically from the . . . Guidelines based on a policy disagreement with those Guidelines," "and not simply based on an individualized determination that they yield an excessive sentence in a particular case"); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010), *cert. denied*, 562 U.S. 838 (2010) ("[D]istrict courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.'" (quoting *Kimbrough*, 552 U.S. at 101)); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) (Easterbrook, C.J.) (career offender guideline) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject *any* Guideline on policy grounds—though they must act reasonably when using that power."); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *United States v. Merced*, 603 F.3d 203, 218 (3d Cir. 2010) ("The government concedes that a sentencing court may vary downward from the Guidelines range generated by the career offender provision based solely on a policy disagreement with the scope of that provision."); *United States v. Martin*, 520 F.3d 87, 96 (1st Cir. 2008) (career offender guideline) (The Supreme Court's recent decision in *Kimbrough* . . . opened the door for a sentencing court to deviate from the guidelines in an individual case even

though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission."); *United States v. Diaz*, 2013 WL 322243, at *3 (E.D.N.Y. 2013) (drug guideline).

This Court's power to impose a variant sentence based on a policy disagreement with the guidelines extends to the career offender guideline, § 4B1.1. Nearly all courts of appeals have concluded that sentencing judges may vary from the career offender guideline based on a policy disagreement with the guideline. *See United States v. Collins*, 474 F. App'x 142, 144, 2012 WL 2087178, at *1 (4th Cir. 2012); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) (Easterbrook, C.J.); *United States v. Mitchell*, 624 F.3d 1023, 1028-30 (9th Cir. 2010); *United States v. Michael*, 576 F.3d 323, 327-28 (6th Cir. 2009); *United States v. Clay*, 524 F.3d 877, 878 (8th Cir. 2008); *United States v. Boardman*, 528 F.3d 86 (1st Cir. 2008); *United States v. Sanchez*, 517 F.3d 651, 664-65 (2d Cir. 2008); *cf. also United States v. Merced*, 603 F.3d 203, 218 (3d Cir. 2010) (government conceded); *In re Sealed Case*, 548 F.3d 1085, 1087 (D.C. Cir. 2008) (government conceded).

> **B.     The Career Offender Guideline Was Not Generated Through Empirical Analysis, and Accordingly This Court Should Place Little Weight in the Advisory Sentencing Range It Produces.**

A district court's authority to vary from the applicable guideline range based on a policy disagreement is enhanced where the guideline at issue was not generated through the Commission's exercise of empirical analysis and technical expertise. *Kimbrough*, 552 U.S. at 109-110; *Diaz*, 2013 WL 322243, at *3. The Commission's policy decisions embodied in the guidelines arguably deserve more weight when they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007). It may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives," where the guideline at issue was based on the Commission's empirical study of average time served before the guidelines, and has been allowed to evolve in response to sentencing data, feedback from judges, practitioners and experts, and

penological research. *See Rita v. United States*, 551 U.S. 338, 348-50 (2007). However, conversely, where the offense guideline at issue was not based on "empirical data and national experience," the Commission's policy choices merit the least deference, as they "do not exemplify the Commission's exercise of its characteristic institutional role.'" *Kimbrough*, 552 U.S. at 109.

In general, the Commission undertook an "empirical approach" to establishing the guidelines, analyzing the data from 10,000 pre-guidelines presentence reports to establish sentencing ranges that attempted to capture past sentencing practice. *See* U.S.S.G., Ch. 1 Pt. A(1)(3); *Rita*, 551 U.S. at 349; Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 7 (1988). The Commission jettisoned this empirical data and approach, however, in creating several guidelines, including the career offender guideline. *E.g.*, U.S.S.C., Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 47 (2004)[8] (hereinafter "U.S.S.C., Fifteen-Year Report") ("For most offenses, the Commission decided to base guideline ranges on the existing average time served . . . . For several other offenses, however, the Commission, either on its own initiative or in response to congressional actions, established guideline ranges that were significantly more severe than past practice."); Breyer, *supra*, 17 HOFSTRA L. REV. at 23-25 (noting that the Commission "deviated from its past practices approach" with respect to the career offender guideline, which was largely dictated by the SRA statute, leaving the Commission with "little legal room to set sentences" in that area); *see also United States v. Newhouse*, 919 F. Supp. 2d 955, 969 (N.D. Iowa 2013) ("The Sentencing Commission has at times strayed from the 'characteristic institutional role' described in the SRA and by the Court

---

[8]    *Available     at*     https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf.

in *Rita*, and, when it has, the resulting guidelines are unlikely to properly reflect § 3553(a) considerations.").

The career offender guideline was not generated through empirical study, nor has it been refined over time to reflect national experience. *See Newhouse*, 919 F. Supp. 2d at 969, 973 ("[U]nlike the guidelines development process described in *Rita*, the Sentencing Commission did not use empirical data of average sentences, pre-guidelines, as the starting point for the Career Offender guideline."); *see generally* Amy Baron-Evans et al., *Deconstructing the Career Offender Guideline*, 2 CHARLOTTE L. REV. 39, 41 (2010) ("Neither the severity of the [career offender] guideline nor its breadth is the product of careful study, empirical research, or national experience."). Instead, it was created based on a congressional directive to the Commission to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized" for certain categories of recidivist defendants. 28 U.S.C. § 994(h) (enacted as part of the Sentencing Reform Act of 1984).[9]

---

[9]    Specifically, Congress directed the Commission as follows:

(h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and--

(1) has been convicted of a felony that is--

(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46; and

(2) has previously been convicted of two or more prior felonies, each of which is--

(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances

This statutory language—aimed at the Commission, not sentencing courts—directed the Commission to generate these harsh sentencing ranges for offenders who were convicted of a so-called "crime of violence" or a controlled substance offense described in, *inter alia*, 21 U.S.C. § 841, and who had two prior convictions for either of those offenses as well.  *Id.*  The career offender guideline was generated by the Commission to implement this directive, using the expedient of increasing both the offense level and the criminal history category to ensure that together they produced an advisory guideline range at or near the statutory maximum for the offense.  *See* U.S.S.G. § 4B1.1.  Thus, the career offender guideline was not generated by reference to past sentencing practice.  Nor have the career offender guideline ranges been adjusted over time to better accord with national sentencing practice—even though data collected by the Commission indicates that the percentage of within-range sentences for career offenders has dropped to less than one-quarter.  *Cf.* 28 U.S.C. § 994(o) ("The Commission periodically shall review and revise, in consideration of comments and data coming to its attention, the guidelines promulgated pursuant to the provisions of this section.").

C.     **The Career Offender Guideline Is Grossly Excessive in the Majority of Cases, Especially Where the Prior Convictions Are Only for Drug Offenses, Leading Sentencing Courts To Frequently Reject It, Even for Defendants Who Technically Qualify.**

The government argues that even if Mr. Rivers does not qualify as a career offender, the Court should vary upward from the guidelines to the equivalent of the career offender range because an iPhone seized from Mr. Rivers during an August 29, 2017, traffic arrest contains text messages and

---

Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.

28 U.S.C. § 994(h).

images consistent with involvement in drug dealing in the year prior to the seizure of the phone.  *See* Gov't Sentencing Memo at 17-24.  However, the government fails to acknowledge that the Sentencing Commission itself and judges around the country are highly critical of imposing career offender sentences on the vast majority of defendants, especially those whose prior convictions involve drug dealing—even for defendants who technically qualify for the career offender guideline.

As early as the Commission's Fifteen-Year Report issued in 2004, the Commission questioned whether the career offender guideline met the purposes of sentencing at all, noting it did undoubtedly have a racially disparate impact.  U.S.S.C., Fifteen-Year Report at 133-34.  The Commission has continued to criticize the career offender guideline as being "overly severe," and requested congressional authority to change it.  In 2016, the U.S. Sentencing Commission published a report to Congress on the career offender guideline, reporting on sentencing data and making certain recommendations.  *See* U.S.S.C., Report to Congress: Career Offender Sentencing Enhancements (August 2016)[10] (hereinafter "U.S.S.C., Career Offender Report").  Observing a substantial decrease in the imposition of within-range sentences for career offenders from fiscal years 2005 to 2014 (from 43.3% to 27.5%), the Commission undertook "to explore concerns that the career offender directive fails to meaningfully distinguish among career offenders with different types of criminal records and has resulted in overly severe penalties for some offenders."  *Id.* at 2.

In its 2016 report to Congress, the Commission reported that the career offender guideline "has resulted in overly severe penalties for certain offenders, which has, in turn, led to increased departures and variances from the guidelines."  U.S.S.C., Career Offender Report at 7.  After conducting a comprehensive study of sentencing practice and recidivism rates, the Commission

---

[10]   *Available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

14

reported that it was "concern[ed]" about "the overall severity of the enhancements for many offenders under the career offender guideline," as well as the guideline's "failure to meaningfully distinguish among career offenders with different types of criminal records." *Id.* The Commission concluded that:

> far-reaching changes [to the career offender guideline] are needed to address these concerns and achieve the goal of a fairer and more rational career offender sentencing regime. The changes should ensure that sentences for repeat offenders are not unduly severe and that they more proportionally take into account the severity of the offenders' prior record so that individuals with different criminal histories are not automatically sentenced in the same manner.

*Id.* at 8. In order to implement these changes, the Commission requested that Congress "amend the career offender directive at 28 U.S.C. § 994(h) to permit the Commission to more effectively differentiate between career offenders with different types of criminal records." *Id.*[11]

---

[11]     Congress has not yet acted on the Commission's request. However, Congress' inaction with respect to the Commission's report does not bear on a district court's sentencing authority. The congressional directive in § 994(h) is directed only to the Commission, not to sentencing courts. *See Corner*, 598 F.3d at 415-16 ("Sentencing judges must implement all statutes, whether or not the judges agree with them—but all § 994(h) requires is that the Sentencing Commission set the [Guideline] sentencing range . . . .   The need to consider this reference point does not imply that the sentence must be within the Guideline range . . . ."); *Mitchell*, 624 F.3d at 1028 ("[The directive in] 28 U.S.C. § 994(h) . . . is a directive to the Sentencing Commission and not to sentencing courts, which are free to vary where appropriate in an individual case.").

    In fact, Congress expressly considered and rejected the option of imposing the career offender mandate on sentencing judges themselves. As explained by the Commission, "The genesis of the career offender directive set forth at 28 U.S.C. § 994(h) was an amendment by Senator Edward M. Kennedy . . . . The Kennedy amendment included proposed language in the career offender mandate that was not a directive to the Commission, but rather a mandate to the sentencing court." U.S.S.C., Career Offender Report at 12. The Commission explained further: "The core of the Kennedy amendment was ultimately made part of . . . 28 U.S.C. § 994(h). There, however, Congress changed the original provision to include a statutory directive to the Commission, rather than as a requirement for sentencing judges, as previously contemplated." *Id.* The Senate Judiciary Committee Report at the time explained the rationale for the change, writing that § 994(h) "replace[d] a provision . . . that would have mandated a sentencing judge to impose a sentence at or near the statutory maximum for repeat violent offenders and repeat drug offenders" because Congress believed that a directive to the Commission would be "more effective," in that the "the guidelines development process" would "assure consistent and rational implementation of the [congressional] view that substantial prison

Sentencing courts have increasingly rejected the overly severe sentencing ranges produced by the career offender guideline. Using data from fiscal year 2014, the Commission classified career offenders into one of three categories: drug-only; "mixed"; or violent-only. For "mixed offenders" (offenders sentenced under the career offender guideline who had at least one drug conviction and one crime of violence conviction)—as Mr. Rivers would be if he qualified—*only 23.5% of defendants received a within-range sentence in fiscal year 2014.* U.S.S.C., Career Offender Report at 35. The Commission found that the average sentence imposed on "mixed offenders" in fiscal year 2014 was 145 months— 63 months less than their average guideline minimum after application of the career offender guideline (212 months), and only 7 months greater than the average guideline minimum before application of the career offender guideline (138 months). *Id.* at 34-35.

The deviation by sentencing courts from the career offender guideline has only continued. "Over the last five years, the rate of within range sentences for career offenders has decreased from 29.6% in fiscal year 2013 to 21.7% in fiscal year 2017." U.S.S.C., *Quick Facts: Career Offenders.* That is, in fiscal year 2017 (the most recent year for which data is available), **more than three-quarters of defendants who qualified as career offenders received *below*-guidelines sentences.** For all defendants who qualified as career offenders in fiscal year 2017, **the average sentence imposed was 144 months**—66 months below the average guideline minimum of 210 months. *Id.* Clearly, the career offender guideline is failing to carve out the "heartland" sentence even for those offenders who technically fall within its strictures—which Mr. Rivers does not even do.

---

terms should be imposed on repeat violent offenders and repeat drug traffickers." S. Rep. No. 98-225, at 175 (1983). For sentencing courts, the governing statutory mandate remains 18 U.S.C. § 3553. Thus, sentencing courts can and should deviate from the career offender guideline whenever and to whatever extent necessary to remain faithful to their statutory sentencing objectives—without regard to the separate statutory strictures that govern the Sentencing Commission's duties.

Many courts have decried the excessive severity of the career offender guideline and imposed sentences dramatically below its advisory range. *E.g.*, *United States v. Newhouse*, 919 F. Supp. 2d 955, 967 (N.D. Iowa 2013) ("I join the growing chorus of federal judges who have rejected applying the Career Offender guideline in certain cases.") (collecting cases). For example, in *United States v. Patzer*, 548 F. Supp. 2d 612 (N.D. Ill. 2008), the defendant pled guilty to two armed bank robberies and to brandishing a firearm under § 924(c). *Id.* at 614. The defendant's guideline range before application of the career offender guideline—taking into account both bank robberies and the 7-year consecutive sentence on the § 924(c)—was 147 to 162 months. *Id.* at 615. However, the defendant qualified as a career offender, based on two prior convictions for a controlled substance offense and aggravated robbery, respectively. *Id.* The career offender guideline ratcheted the defendant's total guideline range up to 346 to 411 months. *Id.* The court rejected the career offender range on the grounds that "the advisory range of 346 to 411 months pursuant to § 4B1.1 overstates the seriousness of Patzer's prior qualifying convictions and is in excess of the sentence required for deterrence." *Id.* at 617. The court ultimately imposed a total sentence of 13 years (6 years on the bank robberies and 7 years consecutive on the § 924(c)). *Id.* at 618.

In another case from this circuit, the sentencing court imposed a sentence 20 years below the career offender guideline range, finding that defendant was not "the 'repeat violent offender' nor 'drug trafficker' targeted by the career offender guideline enhancement." *United States v. Moreland*, 568 F. Supp. 2d 674, 688 (S.D. W. Va. 2008). In rejecting the career offender range of 360 months to life, and instead imposing the mandatory minimum 10 years, the court explained:

> Two relatively minor and non-violent prior drug offenses . . . vaulted this defendant into the same category as major drug traffickers . . . . The career offender guideline provision provides no mechanism for evaluating the relative seriousness of the underlying prior convictions. Instead of reducing unwarranted sentencing disparities, such a mechanical approach ends up creating additional disparities because this Guideline instructs courts to substitute an artificial offense level and criminal history in place of each individual defendant's precise characteristics.

17

*Id.* at 688.[12]

---

[12]    *See also, e.g., United States v. Whigham*, 754 F. Supp. 239, 247-48 (D. Mass. 2010) ("[T]here is also no question that the career offender guidelines are flawed."); *United States v. Fernandez*, 436 F. Supp. 2d 983, 988–90 (E.D. Wisc. 2006) ("Courts have, in pre- and post-*Booker* cases, recognized that the career offender guideline can produce a penalty greater than necessary to satisfy the purposes of sentencing."); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (career offender guideline would produce "colossal increment" from prior sentences of 14 months and 20 months, respectively); *United States v. Phelps*, 366 F. Supp. 2d 580, 590 (E.D. Tenn. 2005) ("[I]t is not unusual that the technical definitions of 'crime of violence' and 'controlled substance offense' operate to subject some defendants to not just substantial, but extraordinary increases in their advisory Guidelines ranges."); *United States v. Poindexter*, 550 F. Supp. 2d 578, 580 (E.D. Pa. 2008) (in an order reducing the defendant's sentence, observing that sentencing court downwardly departed from career offender guideline because it "determined that the career offender designation 'overrepresents the total offense level in this case'"); *United States v. Woody*, No. 09-CR-382, 2010 WL 2884918, at *9 (D. Neb. July 20, 2010) (career offender guideline sentence was "excessively harsh"); *United States v. Malone*, No. 04–80903, 2008 WL 6155217, at *2 (E.D. Mich. Feb. 22, 2008) ("The career offender guideline thus makes the criminal history category a *less* perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses." (quoting U.S.S.C., Fifteen-Year Report at 133-34)); *United States v. Serrano*, No. 04CR.424–19(RWS), 2005 WL 1214314, at *8 (S.D.N.Y. May 19, 2005) (varying from career offender guideline range of 262 to 327 months and imposing 10-year sentence, explaining that, "[a]s Serrano never has spent more than one year incarcerated, despite his three prior criminal convictions involving a controlled substance, any term of imprisonment significantly greater than one year will achieve the deterrent effect underlying the career offender designation"); *United States v. Carvajal*, No. 04-CR-222-AKH, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005) ("[The career offender guidelines] are excessive, in light of the nature of [the defendant's] recidivism, for the Guidelines for Career Offenders are the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria.").

Such sentencing decisions reflect observance of the principles articulated by Judge McConnell of the 10th Circuit only two years after *Booker*:

> [D]istrict courts should not be overly shy about concluding that particular defendants, even if third-time drug sellers, do not have the profile Congress and the Commission had in mind when they directed that sentences for career drug offenders be set at or near the top of the statutory range. *Booker* discretion is at its zenith when sentencing courts make the judgment that the particular conduct of the defendant falls only marginally within the scope of a guideline that even the Commission regards as overbroad and (in some applications) counter-productive.

*United States v. Pruitt*, 502 F.3d 1154, 1172 (10th Cir. 2007) (McConnell, J., concurring), *vacated for reconsideration*, 552 U.S. 1306 (2008).

As a result of the career offender guideline's excessive severity and disregard of distinctions in offenders, deep downward variances from the career offender guideline have become the norm in national sentencing practice.  Mr. Rivers resembles the vast majority of defendants whose conduct and criminal history—while worthy of punishment—does not merit the maximal punishment doled out by the career offender guideline.

> **D.     A 230-Month Sentence Would Be Overly Harsh in This Case and Out of Step with Local and National Practice, and the iPhone Seized in an August 2017 Traffic Stop Does Not Change the Analysis.**

The 230-month sentence sought by the government is drastically out of step with sentences received by defendants with similar records to Mr. Rivers's for similar conduct, not just in the District of Maryland but also around the country.  The more-than-19-year proposed sentence far exceeds the average sentence imposed on defendants who qualify as career offenders—and indeed, is even 20 months longer than the average *guideline minimum* for career offenders (210 months), a guideline which courts depart or vary downward from in more than 78 percent of cases.  *See* U.S.S.C., *Quick Facts: Career Offenders*.  In contrast, the 144-month sentence recommended by the defense in this case comports with the average sentence imposed on offenders who technically qualify for the career offender enhancement.  *Id.*  Indeed, it is even nearly equivalent to the average sentence imposed on those who qualify for the career offender enhancement based on convictions for both drug offenses and crimes of violence (145 months).  *See* U.S.S.C., Career Offender Report at 34-35.  It also comports with sentences meted out in this District for armed robbery committed by individuals with records similar—or frankly worse—than Mr. Rivers's criminal history, even taking into account the government's allegations of drug dealing based on the contents of the iPhone seized August 29, 2017. *See* ECF No. 78, Defense Sentencing Memo, at 16-17.

Mr. Rivers has two prior convictions for drug offenses.  At age 18, he was arrested for distributing cocaine in three hand-to-hand sales of crack cocaine to a confidential informant for a total

of $350 from the three transactions. PSR ¶ 51. He served a little under 2 ½ years' imprisonment for this offense. *See id.* At age 23, Mr. Rivers was again arrested for distributing cocaine, this time when a confidential informant arranged a $60 sale from him through a third party. PSR ¶ 52. Mr. Rivers served a little over 1 ½ years' incarceration on that offense. *See id.* The photos and text messages found on the iPhone seized in an August 2017 traffic stop does not alter the sentencing framework in this case. The evidence from the iPhone alluded to in the government's sentencing memorandum, ECF No. 80 at 17-23, includes evidence of drug dealing and handling of firearms that the government seized at someone else's home.[13] This evidence is largely cumulative of Mr. Rivers's relevant conduct and criminal history, which is already before the Court in the context of this sentencing.

Mr. Rivers's advisory guideline range accounts for his drug offenses without resorting to the career offender guideline. First, these prior convictions naturally elevate Mr. Rivers's advisory sentencing range by attributing 6 criminal history points to him, equivalent to increasing his guideline range by 1 ½ years, from 41-51 months to 57-71 months. *See* U.S.S.G., Ch. 5, Pt. A (total offense level 21 at CHC II versus CHC IV). These prior convictions also elevate Mr. Rivers's sentencing range by increasing his base offense level on Group 2, from 14 to 20. *See* PSR ¶ 31. Taking into account multiple-count adjustments, this difference accounts for an increase of 1 additional offense level in Mr. Rivers's overall offense level. *See* U.S.S.G. § 3D1.4 (imposing 1-level increase where second group is between 5 and 8 levels less serious than first group). This additional offense level represents yet another 6-month increase in Mr. Rivers's advisory sentence. *See* U.S.S.G., Ch. 5, Pt. A (total offense level 20 versus 21 at CHC IV). Thus, Mr. Rivers's advisory guideline sentence is already

---

[13]    The search and seizure of this phone was the subject of a pretrial motion to suppress by the defense. *See* ECF No. 42. Although the defense withdrew this motion upon signing a plea agreement, *see* ECF No. 54, the defense's agreement not to contest the phone's admissibility at sentencing in this matter should not be interpreted as a concession that the search and seizure of this phone was lawful.

enhanced by 2 years as a result of his prior drug convictions, without application of the career offender guideline. This increase sufficiently accounts for Mr. Rivers's prior criminal conduct.

As recognized by the Sentencing Commission and courts in a great majority of cases, *see* Section II.C., *supra*, the career offender guideline would have an unbelievably harsh effect on Mr. Rivers's guideline range (were it to apply). Applying the career offender guideline would dramatically increase his guideline range from the correctly calculated range of 141 to 151 months (*see* ECF No. 76, Defense Sentencing Memo, at 2-3) to 272 to 319 months, *see* U.S.S.G. § 4B1.1 & Ch. 5, Pt. A (offense level 31 at CHC VI, plus 7 years consecutive). That is, applying the career offender guideline would *double* Mr. Rivers's advisory guideline range (which is already elevated by 2 years based on those prior convictions), increasing the bottom of his advisory range to over 22 years. Such an enormous increase in Mr. Rivers's sentencing range based on two prior street-level distribution drug offenses is unjustifiable by any penological measure, would be excessively severe, and would not advance any of the purposes of sentencing. And the information on the iPhone seized in an August 2017 traffic stop does not change the calculus: a 22-year sentence (or the 230-month sentence sought by the Government) cannot be justified under § 3553(a) even if Mr. Rivers was engaged in drug dealing in 2017.

Given local and national sentences imposed for similar offenses and offenders, reflecting the abandonment of the career offender guideline range in more than 78 percent of cases to which it applies, the government cannot credibly justify a 230-month sentence as necessary for general deterrence or to reflect the seriousness of the offense, to promote respect for the law, or to provide just punishment. Nor can the government argue that because it is requesting a sentence slightly below the guidelines range that would apply if Mr. Rivers were a career offender, its sentencing recommendation reflects the variances routinely granted by courts in career offender cases. As previously noted, the average sentence imposed on career offenders is 144 months' incarceration—

not 230 months.  *See* U.S.S.C., *Quick Facts: Career Offenders*.  Indeed, even for career offenders who, like Mr. Rivers, have convictions for both drug offenses and crimes of violence, the average sentence according to the Commission's 2016 report was 145 months.  *See* U.S.S.C., Career Offender Report at 34-35.  Thus, a 230-month sentence would create unwarranted sentencing disparities between Mr. Rivers and similarly situated defendants, in violation of 18 U.S.C. § 3553(a)(6).  Finally, even if Mr. Rivers engaged in drug dealing in 2017, the government cannot explain why a 230-month sentence is necessary as a specific deterrent, where Mr. Rivers has never before served more than 29 months in prison.  The 144-month sentence sought by the defense, which is almost five times longer than any period of incarceration he has ever served, is the sentence sufficient but not greater than necessary to meet the purposes of sentencing in this case.

### III.        The Obstruction of Justice Enhancement Should Not Apply to Mr. Rivers.

The defense briefed the obstruction issue at length in the Defense Sentencing Memorandum. ECF No. 78 at 4-9.  However, a few assertions made in the government's sentencing memo, ECF No. 80, pertaining to the obstruction-of-justice enhancement merit a response.  The government takes two lines from jail calls out of context, changing the meaning of those phrases entirely.  Additionally, the government's sentencing memo indicates that any hypothetical evidentiary value of the destroyed flip phone would be to unrelated investigations, and thus whatever happened to the phone is outside the scope of U.S.S.C. § 3C1.1.

First, the government asserts that on January 20, 2018, when Mrs. Rivers told Mr. Rivers over a jail call that she had found a flip phone in his Jeep, he told her to "tear it up."  ECF No. 80 at 15, 17.  The government has taken that phrase entirely out of context.  While Mr. Rivers used the term "tear it up," he was not referring to the phone; rather, he was asking her to search the car further to see if a second phone was also in the car.  The call began with Mrs. Rivers complaining about her "raggedy ass phone."  Then Mr. Rivers asked, "There wasn't no phones in that car?"  His mother

responded, "yeah, that flip phone."  Mr. Rivers asked, "who flip phone?"  She replied, "I guess it's yours.  I just got it out today."  He then said, "Oh.  How many of them?"  She said, "I only seen one."  He says, "Alright.  Tear it up and make sure you don't see two."  Mrs. Rivers then says that she wants to give one of "them" to her grandson (Mr. Rivers's 13-year-old nephew) to use if someone can pay for the cell-phone service.  Mr. Rivers encourages the idea, telling her the phone service should only be $20 per month.  Mrs. Rivers again says that her grandson definitely needs a phone, and Mr. Rivers says "alright" and asks what numbers are on the phone.  Thus, when the phrase "tear it up" is placed in context, it becomes clear that Mr. Rivers has not told her to destroy the phone; rather he has asked her to search the car further to see whether there is a second phone in the car.  Furthermore, when Mrs. Rivers says that she wants to provide one of the phones to her grandson, Mr. Rivers gives his assent.  Nothing from that call gives the impression that Mrs. Rivers understood her son as directing her to destroy the phone.  To the contrary, he seems content to allow the phone to go to his nephew.

Second, the government also quotes from a January 30 jail call, suggesting that although "the defendant did not say 'destroy the phone' -- . . . the message was very clear."  ECF No. 80 at 17; *see also id.* at 15.  While Mr. Rivers seemed uncomfortable that his mother was referring to the cell phone requested by the grand jury as "the one that was in the car that you told me to delete," he did not send the "message" that the phone should be destroyed.  Quite to the contrary, toward the end of the call, Mr. Rivers and his mother discuss how she is going to get the phone to law enforcement.

Mr. Rivers:     "Alright, well, they asked you for stuff."

Mrs. Rivers:    "Yeah, the phone."

Mr. Rivers:     "Alright, I comprehend that much.  Now what?"

Mrs. Rivers:    "That's it.  They want the phone."

Mr. Rivers:     "Alright, how are you supposed to get it to them, mom?"

| Mrs. Rivers: | "They're going to come get it.  They're going to come and get the phone." |
| Mr. Rivers: | "Alright." |

It is natural that Mr. Rivers wanted to know what kind of information the prosecutor wanted from his mother as he was trying to figure out the scope of the grand jury investigation.  His questions were consistent with trying to gather information about the nature and scope of the grand jury investigation. As to the flip phone itself, as can be seen in the above transcription, Mr. Rivers did not oppose his mother's turning it over to law enforcement; indeed, he even gave his assent when she says they will come pick it up. ███████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

        Third, the government laments that by destroying the phone, Mrs. Rivers "foreclosed any investigation of the phone, or its contents, in the investigation and prosecution of this, *and other matters,* before the grand jury."  ECF No. 80, Gov't Sentencing Memo at 16.  The government has not established that the flip phone would be likely to have any probative evidence regarding the bank robbery.  The only suggestion of a connection between the flip phone and the robbery is the putative phone call from Mr. Rivers to his mother Mrs. Rivers immediately after the robbery.  But if the government were interested in proving the fact and time of that call, there are ample sources of evidence available to the government.  Knowing that the phone was used to call Mrs. Rivers immediately after the robbery, the prosecutor could have gotten a search warrant for Mrs. Rivers's phone or sought cell phone records from service providers for Mrs. Rivers's phone or the flip phone— all of which could easily establish the fact and time of that phone call.  But the government did not pursue that evidence through alternate means because the government did not need that evidence. Establishing the fact and time of that phone call was irrelevant to proving that the robbery occurred.

Indeed, the police seized five other cell phones on January 9, 2018, and the government has failed to articulate that *any* of them contain evidence relevant to proving the robbery.

What seems to really be in play is that the government wanted to use the phone to go on a fishing expedition to explore prosecution of "***other matters***." However, the commentary to guideline § 3C1.1 makes clear that the obstruction bump applies only to the investigation "of the defendant's instant offense of conviction" or "a closely related offense." U.S.S.G. § 3C1.1 cmt. app. n. 1. The defense strongly suspects the government's interest in the phone had nothing to do with "the defendant's instant offense of conviction" or "a closely related offense." As the Court can see from the Government Sentencing Memorandum, the prosecution has relied heavily on photos and text messages obtained from a cell phone seized from Mr. Rivers during a traffic stop on August 29, 2017. ECF No. 80 at 17-23. It seems clear the government's interest in the flip phone is to support a similar fishing expedition for unrelated misconduct.

Rather than tell his mother to destroy the phone once she found it, Mr. Rivers supported her giving the phone to his 13-year-old nephew. Mr. Rivers asked that his mother delete the messages on the flip phone because she was going to give it to a 13-year-old boy. He did so after having her read the messages to him over a recorded jail phone. At the time he asked her to delete the messages, he had no reason to know the grand jury or any other member of law enforcement had any interest in the phone. Once he learned from his mother that the government was interested in the phone, he did not direct her, explicitly or implicitly, to destroy it, but rather assented to her turning the phone over to law enforcement. The government has failed to meet its burden to prove that Mr. Rivers should receive an obstruction-of-justice enhancement.

## IV.       An Aggravating Role Adjustment Should Not Apply Either.

████████████████████████████████████████████████

████████████████████████████████████████████████

These details are highly relevant to whether Mr. Rivers deserves an aggravating role adjustment for being an organizer or leader. Rather than organize, recruit, and lead his co-defendants in the bank robbery, as would be required to qualify for the 2-level bump, Mr. Rivers worked along with Ms.

---

[14]     Thus, the government's argument that Mr. Mclain "did not know that they were on their way to rob a bank until the defendant pulled the Jeep to a stop in an alley near the bank," ECF No. 80, Gov't Sentencing Memo at 12, is misleading and elides Ms. Collier's role in recruiting Mr. Mclain.

Collier and Mr. Mclain.  Ms. Collier recruited her brother to participate in the robbery ███

█████████████████████████████████████████████████████████████████████████████████

Mr. Rivers and Mr. Mclain, who both went into the bank, received nearly equivalent amounts.  Mr.

Rivers does not deserve an aggravating role adjustment under these circumstances.

## CONCLUSION

The Presentence Report correctly concluded that Mr. Rivers is not a career offender.

Furthermore, a career offender or equivalent sentence, including the 230-month sentence requested

by the government, is out of step with sentences imposed on defendants with similar records to Mr.

Rivers's who are being sentenced for similar conduct.  Given that judges depart or vary from the

career offender guideline in more than 78 percent of cases in which it applies, it is clear that a 230-

month sentence is far greater than necessary to meet the purposes of sentencing in this case.  For the

reasons set forth in this pleading as well as in the Defense Sentencing Memorandum, ECF No. 78,

the Court should sentence Mr. Rivers to 144 months' imprisonment.  Such a sentence falls within the

correctly calculated guidelines range, without enhancements for obstruction of justice or aggravating

role ( neither of which should apply in this case), and with a 1-point departure for over-representation

of criminal history because a traffic offense pushes Mr. Rivers from criminal history category IV to V.

A 144-month sentence, which is almost five times longer than any period of incarceration Mr. Rivers

has ever served, is the sentence that is sufficient, but not greater than necessary, to meet the purposes

of sentencing in this matter.

Respectfully submitted,


JAMES WYDA
Federal Public Defender for the District of Maryland

_____/s/_____
KATHERINE TANG NEWBERGER (#27803)
Senior Litigation Counsel

REBECCA S. TALBOTT (#803577)
Assistant Federal Public Defender

Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland  21201
Phone: (410) 962-3962
Fax:  (410) 962-0872
Email:  katherine_newberger@fd.org
            rebecca_talbott@fd.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 5, 2018, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification to all counsel of record.


_____/s/_____
REBECCA S. TALBOTT (#803577)
Assistant Federal Public Defender